IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SAHRO S.A. ABDULLAHI, | ) | |
| | ) | |
| Plaintiff, | ) | 4:12CV3185 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM AND ORDER ON |
| Commissioner of the Social Security | ) | REVIEW OF THE FINAL DECISION |
| Administration, | ) | OF THE COMMISSIONER OF THE |
| | ) | SOCIAL SECURITY |
| Defendant. | ) | ADMINISTRATION |
| | ) | |

On August 31, 2012, Sahro S. A. Abdullahi filed a complaint against Michael J. Astrue, who was then serving as Commissioner of the Social Security Administration.[1] (ECF No. 1.) Abdullahi seeks a review of the Commissioner's decision to deny her application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF No. 13.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 15; Def.'s Br., ECF No. 21.) I have carefully

---

[1] On February 14, 2013, Carolyn W. Colvin was appointed to serve as Acting Commissioner of the Social Security Administration; shortly thereafter, she was automatically substituted as a party in this case pursuant to Federal Rule of Civil Procedure 25(d). (See Notice of Substitution, ECF No. 18.)

reviewed these materials, and I find that the case must be affirmed.

## I.   BACKGROUND

Abdullahi filed an application for SSI benefits on or about July 16, 2009. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 64-69.)   The application was denied on initial review, (id. at 24, 28-31), and on reconsideration, (id. at 26, 33-36).   Abdullahi then requested a hearing before an ALJ.   (Id. at 37.) This request was granted, and a hearing was held on March 9, 2011.   (E.g., id. at 562.) Abdullahi speaks little English and suffers from a hearing impairment, and she had difficulty working with the interpreter (who was participating in the hearing remotely).   (Id. at 566-70.)   As an alternative to rescheduling the hearing on a date when the interpreter could be present physically, Abdullahi's attorney suggested that the case be decided on the written record.   (Id. at 570.)[2]   On or about April 1, 2011, Abdullahi submitted a videotaped statement to the ALJ, along with a transcript.   (Id. at 196-97.   See also id. at 170-195.)   These materials are included in the record, (see id.), and the ALJ considered them when making her decision, (e.g., id. at 15, 18).

In a decision dated May 27, 2011, the ALJ concluded that Abdullahi "has not been under a disability, as defined in the Social Security Act, since July 15, 2009, the date the application was filed."   (Id. at 23 (citations omitted); see also id. at 12-23). Abdullahi requested that the Appeals Council of the Social Security Administration review the ALJ's decision.   (E.g., id. at 11.)   This request was denied, (see id. at 7-9), and therefore the ALJ's decision stands as the final decision of the Commissioner.

---

[2] Abdullahi later agreed in writing that the ALJ's decision should be made on the record.   (Tr. at 63.)

2

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Abdullahi claimed that she became disabled on July 15, 2009, due to lupus.  (Tr. at 101.)  She was born in January 1967, (id. at 174), and she completed the sixth grade while living in Somalia, (id. at 175).  Abdullahi "can speak a little bit" of English.  (Id. at 175.)  She has work experience as a warehouse stocker.  (Id. at 102.)

### A.   Medical Evidence[3]

Abdullahi has carried a diagnosis of systemic lupus erythematosus since 2004.  (See Pl.'s Br. at 13-16, ECF No. 15.)  In addition, records indicate that she has "mild to severe sensorineural hearing loss in the left ear and severe to profound sensorineural hearing loss in the right ear."  (Tr. at 405.)  There is no evidence that Abdullahi's hearing loss has caused any work-related restrictions, however.  On the contrary, records show that Abdullahi worked full-time after her hearing problems were diagnosed.  (E.g., id. at 177, 179, 447.)  Records also show that Abdullahi was "satisfied with her hearing without [hearing] aids."  (Id. at 447.)

The remainder of this review will focus on records dated within approximately one year prior to the alleged onset date.

Abdullahi visited Dr. Ed Ford at the Plum Creek Medical Group on October 3, 2008, and reported experiencing chest pain.  (Tr. at 251.)  She described the pain as "burning," and she indicated that it had been increasing gradually over the previous months.  (Id.)  She also said that aspirin relieved her pain.  (Id.)  Dr. Ford

---

[3] My review of the medical evidence emphasizes the records cited by the parties in their briefs.  (See Pl.'s Br. at 4-16, ECF No. 15; Def.'s Br. at 2-8, ECF No. 21.)  I note, however, that Abdullahi's failure to provide citations to the relevant pages of the transcript has made it difficult for me to locate the records that she cites.

prescribed Flexeril and directed Abdullahi to follow up in two weeks.  (Id. at 252.)

Abdullahi followed up with Dr. Ford on October 16, 2008, and reported that she had been attending physical therapy twice per week with good results, but her pain returned in the evening.  (Id. at 253.  See also, e.g., id. at 219-20.)  She also reported that her medication was effective and that she was not experiencing any side effects.  (Id.)  Dr. Ford directed Abdullahi to return for another follow-up in two weeks.  (Id. at 254.)

In a record dated October 30, 2008, Dr. Ford noted that Abdullahi appeared for a follow-up regarding her lupus, which was causing a "moderate" physical impact. (Id. at 255.)  Abdullahi was prescribed medication and directed to follow up as needed.  (Id. at 256.)

Abdullahi visited Dr. Ford again on November 5, 2008, and reported that she had been suffering from a headache for the past few days.  (Id. at 258.)  She attributed the headache to her new medication, although she noted that her chest pains had resolved.  (Id.)  Dr. Ford diagnosed systemic lupus erythematosus and directed Abdullahi to "follow up as scheduled."  (Id.)

On November 15, 2008, Abdullahi visited Ann Young, APRN, at the Plum Creek Medical Group and reported experiencing sharp pain in her chest over the past two days.  (Id. at 260.)  She also reported fatigue, dyspnea, and pain with deep inspiration.  (Id.)  Nurse Young noted that Abdullahi's pain had been attributed to lupus, and that Abdullahi has a history of leukopenia.  (Id.)  Abdullahi's medications were altered, and she was directed to follow up in the emergency room if her pain persisted.  (Id. at 261.)  She was also advised that she needed to be under the care of a rheumatologist.  (Id.)

Abdullahi visited Nurse Young on December 22, 2008.  (Id. at 269.)  Nurse

4

Young noted that Abdullahi "was to return to work at Goodwill 7 hours a day," but "[s]he cannot handle this b/c of the recurrent chest pains." (Id.) Nurse Young also noted, "Dr. Ed Ford had a form minimally filled out on October 31st saying her prognosis is good but did not explain her disease process and the fact that she is on high risk medication to keep her disease under stable control.  I recommend that she not return to work at this time until we can keep symptoms under control for at least six months without setback." (Id.)

Nurse Young completed a Physician's Confidential Report form on December 23, 2008. (Id. at 222-23.)  Nurse Young indicated that Abdullahi's diagnoses were systematic lupus erythematosus, chest pain, gastrointestinal reflux disease, and leukopenia. (Id. at 222.) She also indicated that Abdullahi's prognosis was "fair with close monitoring of medications"; that her leukopenia causes her to have a "low white count," which in turn affects her immune system and causes fatigue; and that "her lupus causes severe joint pain and chest pain." (Id. at 222-23.) Nurse Young opined that Abdullahi's conditions caused no limitations in activities of daily living "as long as she can take breaks"; that Abdullahi is "unable to be on her feet for more than 2 hours"; and that she "should not be in tight quarters or [large groups] of people" due to her leukopenia.  (Id. at 223.)

Nurse Young also examined Abdullahi on December 23, 2008. (Id. at 271-72.) Abdullahi's chest was tender to the touch, upon breathing, and upon coughing. (Id. at 271.)  However, she had "[f]ull range of motion in all joints," "[n]o pain on movement of all joints," and "[n]ormal joints and muscles." (Id. at 272.)

On April 21, 2009, Abdullahi reported to Nurse Young that she was vomiting and suffering pain in her chest, shoulders, and back. (Id. at 281.) Nurse Young noted that Abdullahi had been "flaring with her lupus for the last three weeks," and she was

suffering "arthralgias in hands, shoulders, and left chest wall." (Id.)  Abdullahi was instructed to take medications, stay away from large groups of people, and return for a follow-up "very soon."  (Id. at 282.)  Abdullahi returned for her follow-up on April 26, 2009, and reported that she "feels well with minor complaints," and she had been compliant with her medications.  (Id. at 284.)

On July 17, 2009, Abdullahi visited Nurse Young and reported fatigue and abdominal pain, but no joint or chest pain.  (Id. at 290.)  She also revealed that she was not taking her medications.  (Id.)  Nurse Young advised Abdullahi that it was important that she take her medications.  (Id.)

On August 6, 2009, Abdullahi reported that she was experiencing swelling since she restarted her medications.  (Id. at 292.)  She said that she "feels ok at rest but when she exerts she has pains."  (Id.)  Nurse Young prescribed new medications and ordered lab testing.  (Id. at 293.)

On August 24, 2009, Abdullahi visited Alan Erickson, M.D., at the Nebraska Medical Center in Omaha, Nebraska, for an evaluation of her lupus.  (Id. at 229-31.)  Dr. Erickson diagnosed "[s]ystemic lupus erythematosus manifested by acute idiopathic pericarditis along with a positive antinuclear antibody test."  (Id. at 230.)  He also noted that Abdullabi had a history of leukopenia, pericarditis, and serositis.  (Id. at 229-30.)  Dr. Erickson ordered a series of lab tests and a referral to a cardiologist.  (Id. at 230.)  He made no changes to Abdullahi's medication regimen, and he directed her to return within "the next several weeks."  (Id.)

Abdullahi followed up with Dr. Erickson on September 24, 2009, and reported that her biggest complaints were "the swelling and side effects related to her prednisone."  (Id. at 224.)  Dr. Erickson decide to add Plaquenil to Abdullahi's medication regimen and reduce her prednisone dosage.  (Id. at 225.)  He also advised

Abdullahi to follow up with her primary care physician "for her low TSH." (Id.)[4]

Also on September 24, 2009, Abdullahi visited Nattapong Sricharden, M.D., at the Nebraska Medical Center Clarkson West Cardiology Clinic. (Id. at 226-27.) Dr. Sricharden noted that Abdullahi has systemic lupus, pericarditis, leukopenia, dyspnea, and "pericardial window in the past." (Id. 226.) Abdullahi reported that she was suffering from "needle-type pain" that was "not exertional and occurs mostly on the right side of the chest," sometimes moving from the front to the back. (Id.) She also said that massage often causes her to feel better. (Id.) Dr. Sricharden wrote,

> Essentially, [this is] a 42-year-old woman with atypical chest pain, not consistent with either ischemia or pericarditis. This sounds musculoskeletal, likely due to her lupus status. Echocardiogram today showed normal function with minor effusion but no restriction or constrictive physiology. Also, the EKG is not suggestive of pericarditis. At this point, she should continue with her medication for lupus. She can take some pain medication, and perhaps massage therapy might be helpful. Again, this is noncardiac pain.

(Id. at 227.)

Jerry Reed, M.D., completed a Physical Residual Functional Capacity Assessment form on October 23, 2009. (Id. at 208-16.) After studying the available records, Dr. Reed concluded that Abdullahi was capable of lifting 20 pounds occasionally and 10 pounds frequently; that she could stand and/or walk at least 2 hours in an 8-hour workday with normal breaks; that she could sit for a total of about 6 hours in an 8-hour workday with normal breaks; and that her ability to push and/or pull (within her lifting restrictions) was unlimited. (Id. at 209.)

Nurse Young wrote a letter dated December 16, 2009, stating,

---

[4] The parties each indicate that "TSH" refers to "thyroid-stimulating hormone." (Pl.'s Br. at 6, ECF No. 15; Def.'s Br. at 3, ECF No. 21.)

Sahro is a patient of mine who suffers from Systemic Lupus
Erythematosus. She has had multiple health problems related to the
Lupus including Pericarditis. . . . She is treated with high dose
medications including Cellcept, Plaquenil, and Prednisone daily. She
follows up with me in the clinic every three months and sooner if flares.
I do not recommend that she work due to her health condition and high
risk medications.

(Id. at 246)

Abdullahi visited Nurse Young on December 23, 2009, and reported that she
was doing "much better" since her last visit. (Id. at 244.) Her medications were
effective and were causing no side effects. (Id.) An exam revealed muscle tightness
and tenderness in the scapular area, and Nurse Young prescribed Flexiril. (Id. at
244.)

On January 12, 2010, Abdullahi visited Nurse Young and complained of
headaches. (Id. at 241.) Nurse Young diagnosed a viral infection and advised
Abdullahi to treat the symptoms, rest, and return if her symptoms worsened. (Id. at
242.) Abdullahi returned on February 15, 2010, and reported suffering from a cough,
fever, runny nose, and sore throat for the past five days. (Id. at 239.) She was
diagnosed with cough, acute sinusitis, and acute bronchitis, and she was prescribed
medications. (Id. at 240.)

On March 16, 2010, Abdullahi again visited Nurse Young with complaints of
headaches, chest aches, back pain, and fevers during the past week. (Id. at 330.)
Nurse Young treated Abdullahi's complaints as a Lupus "flare," and she made
adjustments to Abdullahi's medications. (Id. at 331.)

On March 31, 2010, Glen Knosp, M.D., reviewed the records, including Nurse
Young's recommendation that Abdullahi not work "due to her health condition and
high risk medications." (Id. at 217-18.) Dr. Knosp concluded that although

8

consideration would be given to Nurse Young's opinion, it was not given controlling weight.  (Id. at 217.)  He also concluded that there was no evidence that Abdullahi's condition had changed significantly, and he reaffirmed Dr. Reed's RFC assessment. (Id.)

Abdullahi visited Nurse Young on April 6, 2010, and stated that her blood pressure had been "running high," and she was having headaches.  (Id. at 328.) Otherwise, she had no complaints.  (Id.)  Nurse Young diagnosed hypertension and prescribed medication.  (Id. at 329.)

On May 4, 2010, Abdullahi reported to Nurse Young that she stopped taking her Cellcept because it was making her dizzy.  (Id. at 325.)  Since that time, she began to suffer from a cough and congestion.  (Id.)  She also reported suffering from chest pain, difficulty breathing on exertion, joint pain, and myalgia.  (Id.)  Nurse Young noted that Abdullahi's white blood count was "very low," possibly because she was not taking her medication.  (Id. at 326.)  She also noted that Abdullahi's cold symptoms would be treated aggressively, and Abdullahi was directed to follow up as soon as possible if her symptoms worsened.  (Id.)

Abdullahi visited Nurse Young on August 16, 2010, with complaints of "myalgias and arthralgias throughout."  (Id. at 320.)  Nurse Young's record states, "[Abdullahi] states thaht she has red, hot, swollen joints + fatigue.  She has been off of Cellcept and Plaquenil for an unknown amt. of time.  [Abdullahi] has continued on low dose Prednisone.  She also has been having headaches.  Almost in tears which is unlike [her].  Not sleeping well b/c of pain.  No rashes.  No chest pain."  (Id.) Nurse Young directed Abdullahi to rest, to take her medications as prescribed, and to follow up in four days.  (Id. at 321.)

On August 20, 2010, Abdullahi followed up with Nurse Young and reported

9

that she was feeling much better. (<u>Id.</u> at 318.) She had been taking her medication as prescribed, and she had only "minor complaints." (<u>Id.</u>)

Abdullahi returned for another follow-up with Nurse Young on September 21, 2010. (<u>Id.</u> at 315.) She reported that she had been experiencing increasing myalgia during the previous two weeks, and that she was taking less Prednisone. (<u>Id.</u>) She also reported experiencing chest wall pain beginning on the previous day. (<u>Id.</u>) Abdullahi's "joint exam" was "completely normal." (<u>Id.</u> at 316.) She was directed to increase her Prednisone dosage, and Nurse Young ordered lab tests. (<u>Id.</u>)

On October 22, 2010, Abdullahi visited Nurse Young with complaints of vomiting, fever, headache, and nausea. (<u>Id.</u> at 311.) Nurse Young diagnosed viral enteritis, and she directed Abdullahi to decrease her dosage of one of her medications and follow up in two weeks. (<u>Id.</u> at 312.)

Abdullahi visited Nurse Young on November 5, 2010, and reported that she was having chest pain and difficulty sleeping. (<u>Id.</u> at 308.) It appeared that she was not taking her medications. (<u>Id.</u>) Abdullahi was advised to restart her medications and return again in two weeks. (<u>Id.</u> at 309.)

On December 29, 2010, Abdullahi reported that she had been experiencing sharp abdominal pain and chest pain during the previous three days. (<u>Id.</u> at 305.) Nurse Young concluded that Abdullahi appeared to have "a viral syndrome," and Abdullahi was instructed to rest and consume fluids. (<u>Id.</u> at 306.)

### B.   Abdullahi's Statement

As noted previously, a hearing was scheduled for March 9, 2011, but Abdullahi had difficulty communicating with the interpreter. (Tr. at 562, 566-70. <u>See also</u> <u>supra</u> Part I.) Rather than rescheduling the hearing, Abdullahi elected to submit a videotaped statement and have her case decided on the written record. (<u>Id.</u> at 63, 170-

10

197, 570.)

In her statement, Abdullahi testified that she was born in Somalia in 1967.  (Id. at 174.)  She came to the United States in July 1996.  (Id. at 173.)  She attended school in Somalia, where she reached the sixth grade, and she attended two years of school in the United States.  (Id. at 175.)  She said that she can understand English, and she "can speak a little bit."  (Id.)  She also said that she as "a little bit of a hearing problem."  (Id. at 176.)

Abdullahi testified that she lived in Minnesota for eight years, and she worked from 2000 to 2003 at an assembling company and at Goodwill.  (Id. at 176-77.)[5]  She has not worked full-time since 2003.  (Id. at 179.)  She testified that she stopped working after she became sick and underwent surgery on her chest.  (Id. at 179-80.)  She said that she continues to have pain in her chest and arms, and she rates her chest pain as a 10 on a 10-point scale.  (Id. at 180.)  Abdullahi said that her doctors have told her that she suffers from lupus, and she takes medication for it, but she does not know what lupus is.  (Id.)

Abdullahi said that she can only lift five pounds, and she can only walk for approximately ten minutes before she must stop and rest.  (Id. at 183.)  She also said that she can sit for about two hours, and she can stand for about seven or eight minutes.  (Id. at 183-84.)  Bending, kneeling, and squatting cause her to feel as if she is suffocating.  (Id. at 184.  See also id. at 187.)  She experiences shoulder pain when she reaches to lift something, and she cannot use tools.  (Id. at 184-85.)  Abdullahi testified that she does have a driver's license, but she limits her driving to short five-

---

[5] Abdullahi's work background form states that she performed assembly work from January 1, 2001, to June 6, 2002, and that she worked at Goodwill from February 15, 2003, to May 4, 2003.  (Tr. at 136.)

minute trips. (Id. at 185-86.) Abdullahi also testified that her chest pain interferes with her sleep. (Id. at 186-87, 191-92.)

Abdullahi lives with three of her children, ranging in ages from thirteen to eighteen. (Id. at 188-89.) The children clean the home, wash clothes, and cook food, and Abdullahi tries to help them until she feels pain or fatigue. (Id. at 189-90.) Abdullahi added that her doctors have told her that she "cannot do anything pretty much at all," and she should "stay calm and relaxed." (Id. at 191.) She does not watch television, listen to the radio, or sleep during the day. (Id. at 192-93.)

## C. Vocational Expert's Testimony

The ALJ obtained testimony from a Vocational Expert (VE) via written interrogatories. (Tr. at 198.) The ALJ's interrogatories included the following question.

> Assume a hypothetical individual who was born [in] 1967, is not able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as described [by the VE in response to a previous question about Abdullahi's work experience within the past 15 years]. Assume further that this individual has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she needs to change positions at the workstation every thirty minutes. The individual can occasionally climb ramps and stairs but should avoid climbing ladders, ropes and scaffolds. The individual should avoid extreme cold, unprotected heights and operational control of moving machinery. The individual should avoid working with the public.

(Id. at 200.) The ALJ asked the VE whether this individual could perform any of Abdullahi's past jobs "as actually performed by the claimant or as normally performed in the national economy." (Id. at 201.) The VE responded in the negative. (Id.) The ALJ then asked whether this individual could "perform any unskilled occupations with jobs that exist in the national economy." (Id. at 202.) The VE

responded affirmatively and noted that the individual could perform unskilled sedentary work as an "optical goods assembler," "wire wrapper," and "ampoule sealer." (Id. at 202, 204.) She added that there were 100 optical goods assembler jobs in Nebraska and 10,000 in the United States; there were 150 wire wrapper jobs in Nebraska and 41,600 in the United States; and there were 300 ampoule sealer jobs in Nebraska and 27,400 in the United States. (Id. at 204.)

Abdullahi's attorney submitted objections to the VE's testimony in a letter dated May 3, 2011. (Id. at 205.) Specifically, he objected to the VE's claim that Abdullahi could work as a wire wrapper or ampoule sealer on the ground that those jobs were not available in Nebraska in sufficient numbers. (Id.) He also argued that the record does not contain substantial evidence showing that Abdullahi could perform full-time sedentary work. (Id.)

### D.  The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 416.920(a) In this case, the ALJ proceeded to step five and found Abdullahi to be not disabled. (See Tr. at 15-23.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 416.920(a)(4)(i), (b). The ALJ found that Abdullahi "has not engaged in substantial gainful activity since July 15, 2009, the application date." (Tr. at 17 (citation omitted).)

13

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 416.920(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 416.920(a)(4)(ii), (c); id. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.921(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 416.920(a)(4)(ii), (c).  The ALJ found that Abdullahi "has the following severe impairments: systemic lupus erythematosus (lupus), pericarditis, leucopenia, and low TSH."  (Tr. at 17 (citation omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 416.920(a)(4)(iii).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 416.920(a).  The ALJ found that Abdullahi "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (Tr. at 17 (citations

14

omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[6] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 416.920(a)(4)(iv), (f). The ALJ concluded:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she needs to change positions at the workstation every thirty minutes. The claimant can occasionally climb ramps and stairs, but should avoid climbing ladders, ropes, and scaffolds. The individual should avoid extreme cold, unprotected heights and operational controls of moving machinery. The claimant should also avoid working with the public.

(Tr. at 17.) The ALJ also found that Abdullahi "has no past relevant work." (Id. at 22 (citation omitted).)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See 20 C.F.R. § 416.920(a)(4)(v), (g). The ALJ noted that Abdullahi "was 42 years old, which is defined as a younger individual age 18-44, on the date the application was filed," and

---

[6] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

that Abdullahi "is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English." (Tr. at 22.) The ALJ then wrote, "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Id. at 22 (citations omitted).)

## E.   Additional Evidence

After the ALJ issued her unfavorable decision, Abdullahi submitted three new exhibits to the Appeals Council. (Tr. at 10, 553, 557-61.) The first exhibit is a letter signed by Joseph S. Miller, M.D., F.A.A.F.P., and dated June 30, 2011. (Id. at 553.) In this letter, Dr. Miller states that Abdullahi "has significant Lupus Erythematous," which causes her "significant disability." Dr. Miller added, "She has pericarditis, chronic chest pain, and chronic muscle and joint pain. At this point she is unable to do some of her activities of daily living and unable to do any type of work. Sahro is significantly hypertensive due to the lupus effects on her body." (Id. at 553.) He also wrote that Abdullahi had recently visited a rheumatologist named "Dr. Erikson," and she was "starting new medications that hopefully will in time help her to function better." (Id.)

The second exhibit is a letter signed by Alan Erickson, M.D., and dated July 15, 2011. (Id. at 560.) Dr. Erickson wrote,

> Ms. Abdullahi is a patient who is followed in the Rheumatology Clinic with a prior diagnosis of systemic lupus ertythematosus. In the past her systemic lupus erythematosus has been diagnosed based on serological testing and also with a history of pericarditis. Her pericarditis has left her with chronic chest wall and cardiopulmonary symptomatology for which she has been on a host of other medications in the past to include prednisone which is a very powerful anti-inflammatory, Plaquenil therapy which is standard anti-inflammatory therapy for lupus and CellCept therapy which is also a powerful anti-

16

> inflammatory.  Other medicines also include Imuran therapy which is
> also another potent immunosuppressant therapy.

(Id.)   He also reviewed the symptoms described by Abdullahi in her recorded statement and noted, "All of these have made it very difficult for her to have any kind of meaningful employment.  These symptoms would all be consistent with her diagnosis as outlined.  It is . . . my opinion that the patient's symptoms are consistent with her diagnosis and that there is little to no chance of her being able to engage in any meaningful long-term employment in the foreseeable future, at least greater than one year."  (Id. at 560-61.)

The third exhibit is a rheumatology progress note that was dictated by Dr. Erickson.  (Id. at 557-59.)  The note states that Abdullahi visited Dr. Erickson on July 7, 2011, for a follow-up.  (Id. at 557.)  Abdullahi reported chest wall pain and body aches, but no fevers, chills, nausea, sweats, vomiting, or diarrhea.  (Id.)  She also reported that she was not taking her CellCept, and she believed that her Plaquenil "may have caused some sort of a reaction."  (Id.)  Dr. Erickson noted that it was "hard to really sort out the cause of her chest wall pain," and he believed "it is multifactorial to include a possible component of pericarditis."  (Id. at 558.)  He recommended that Abdullahi move from "corticosteroid therapy" to "an antimalarial regimen," and Abdullahi agreed to alter her medications.  (Id.)

The Appeals Council considered the additional evidence, but determined that it "does not provide a basis for changing the Administrative Law Judge's decision."  (Id. at 8.  See also id. at 7-10.)

## III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is

17

substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

# IV.   ANALYSIS

Abdullahi argues initially that the Commissioner's decision must be reversed for four reasons: "1.  Failure to provide a competent translator who speaks the same dialect as claimant.  2.  Failure to continue the hearing pending obtaining a competent stenographer.   3.   Ignoring the claimant's transcribed testimony provided by claimant's attorney using a qualified translator of claimant's dialogue.  4.  Ignoring claimant's hearing deficiencies."  (Pl.'s Br. at 3-4, ECF No. 15.)  None of these arguments is persuasive.

First, the record shows that the ALJ intended to continue the hearing due to Abdullahi's inability to communicate effectively through the translator, but Abdullahi's counsel suggested that the case be decided on the written record without a hearing.  (Tr. at 570.)  Abdullahi issued a written statement expressing her agreement with this plan.  (Id. at 63.)   Under the circumstances, Abdullahi's complaint that she was deprived of a suitable translator is not well-taken.  Second, the record contains no evidence of any problems with a "stenographer."  Third, the record clearly shows that the ALJ considered Abdullahi's transcribed statement.  (See Tr. at 15, 18, 19.)[7]  Finally, the ALJ properly excluded Abdullahi's hearing loss from her list of severe impairments because Abdullahi failed to raise it in her application for benefits or in her testimony.  See, e.g., Smith v. Astrue, 232 F. App'x 617, 619 (8th

---

[7]  Although Abdullahi does not argue specifically that the ALJ erred by discrediting Abdullahi's testimony, I have considered that issue, and I find that the ALJ "explicitly discredit[ed] the claimant's testimony and [gave] good reason for doing so."  Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).  (See also Tr. at 18-21.)  I also find that the ALJ's credibility analysis is supported by substantial evidence even when Abdullahi's supplemental exhibits are taken into account.  E.g., Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000).

Cir. 2007) ("We have repeatedly stated that an ALJ has no duty 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" (citations omitted)); Davis v. Barnhart, 197 F. App'x 521, 522 (8th Cir. 2006) (per curium) ("We conclude the ALJ did not err in failing to consider Davis's weight as an impairment, as Davis did not allege obesity in her application or testify about limitations resulting from her weight.").  Moreover, as noted previously, Abdullahi was able to work in the past despite her hearing impairment, and there is no evidence that her hearing problems have worsened since that time.  See Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (1990)).  Under the circumstances, Abdullahi's hearing loss cannot be used to establish disability.  See id.

Abdullahi also argues that the Commissioner's decision must be reversed because "[t]he ALJ did not specify in her hypothetical to the VE each of the limitations she found to exist in the claimant," and the ALJ's "opinion does not reveal what limitations were considered by the VE and the extent thereof."  (Pl.'s Br. at 19, ECF No. 15.  See also id. at 18-22.)

The ALJ determined Abdullahi's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and a nurse, the opinions of consulting physicians, and Abdullahi's own testimony (to the extent that it was deemed credible).  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  See also 20 C.F.R. § 416.945.  I find that the particular limitations specified by the ALJ are supported by substantial evidence, even when Abdullahi's supplemental exhibits are taken into consideration.  Furthermore, the ALJ's hypothetical question included all of the limitations that were identified by the ALJ in her RFC assessment, and therefore the VE's testimony constitutes substantial evidence in support of the

Commissioner's decision.  See Perkins v. Astrue, 648 F.3d 892, 901-02 (8th Cir. 2012) (stating that a hypothetical is sufficient if it captures the concrete consequences of the claimant's deficiencies and sets forth impairments that are supported by substantial evidence and accepted as true).  Abdullahi's claim that the ALJ's hypothetical fails to specify Abdullahi's limitations is simply not accurate.  (See Tr. at 17, 200-02.)

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated December 2, 2013.

BY THE COURT

_Warren K. Urbom_

Warren K. Urbom
United States Senior District Judge

21